Valentine E. Macy, Jr. v. Commissioner.
Macy v. Commissioner
Docket No. 15747.
United States Tax Court
1949 Tax Ct. Memo LEXIS 291; 8 T.C.M. (CCH) 45; T.C.M. (RIA) 49009; January 18, 1949
*291 1. The petitioner was engaged in the development of new business ventures and the organization and promotion of various corporations. In 1929 and 1930 he became interested in the development of a company for the manufacture of fountain pens and invested substantial amounts of money in this company. During the period 1932 to 1936 he advanced various amounts to the company aggregating $550,000. These amounts were carried on the books of the pen company and on petitioner's books as loans on open account. Petitioner made these advances in the hope and belief that the pen company would be a financial success and that he would be repaid. He was repaid to the extent of $248,000, leaving a balance due him of $302,000. The pen company ceased active operations in 1942 due to the lack of business and the difficulty in obtaining personnel and supplies due to the war. The petitioner determined at the close of the year 1942 that the indebtedness due him from the pen company was partially worthless to the extent of $234,539.10 and charged that amount off on his books and deducted it in his return for 1942. Held, that the advances which petitioner made to the pen company were bona fide loans and *292 represented business rather than nonbusiness debts. Vincent C. Campbell, 11 T.C. 510, followed. Held, further, that the indebtedness became worthless in part in 1942 and the petitioner is entitled to the bad debt deduction which he claims under the provision of section 23 (k) of the Internal Revenue Code. 2. The petitioner loaned sums of money to a partnership of which he was a limited member and to a corporation in which he was a stockholder for which he received collateral notes. These firms were organized for the development and promotion of various products, patents and processes. The partnership was dissolved in 1943 and no amount of the note was paid. The corporation in 1943 was without funds and on or about April 1943 forfeited its charter. Held, that the loans which petitioner made to these debtors were business rather than nonbusiness debts. Held, further, that these debts became worthless in 1943 and petitioner is entitled to the bad debt deductions which he claims in his return. William H. Hall, Esq., and George W. Saam, Esq., 50 Broadway New York, N. Y., for the petitioner. William F. Evans, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in petitioner's income tax for the taxable year ended December 31, 1943 in the amount of $45,417.54. The deficiency is due to several adjustments to petitioner's net income as disclosed by his returns for the years 1942 and 1943. The only *294 adjustment for 1942 which petitioner contests is the disallowance by the respondent of a bad debt deduction in the amount of $234,539.10. The Commissioner explained this adjustment in his deficiency notice as follows: "(a) and (c) It is held that the partial bad debt loss of $234,539.10 claimed on line 16 of your return for the year 1942 represents a long-term capital loss resulting from worthlessness of your investment of $302,000.00 in the Chilton Pen Company, Inc. Accordingly, the bad debt loss, claimed on your return in respect thereof, has been disallowed and in lieu thereof there has been allowed a limited net capital loss of $1,000.00 in accordance with section 117(d)(2) of the Internal Revenue Code." The only adjustment for 1943 which petitioner contests is adjustment (a) which consisted of a disallowance by the respondent of losses in the amount of $33,000. The respondent explained this adjustment in his deficiency notice as follows: "(a) It is held that the bad debts of $15,000.00 due from Extrusion Engineering Syndicate and $18,000.00 due from Hoepli & Company, claimed in the aggregate amount of $33,000.00 on lien 16 of your return for the year *295 1943, constitute non-business bad debts within the meaning of section 23(k)(4) of the Internal Revenue Code. Therefore, any loss from the worthlessness thereof would be a short term capital loss, unavailable as a deduction for income tax purposes in 1943 due to the limitation provisions of section 117 of the Internal Revenue Code. It is held, further, that no deduction in respect of the aforementioned debts is allowable for victory tax purposes in view of the provisions of section 29.451-2(a)(4) of Regulations 111." The petitioner by appropriate assignments of error contests the correctness of these adjustments. The petitioner also affirmatively alleged in his petition that the respondent erred in failing to allow as a deduction from income for the year 1943 the sum of $42,921.68 as a loss sustained by petitioner on the disposition of 950 shares of the capital stock of the 36 East 72nd Street Corporation and the termination of his proprietary lease. While petitioner did not specifically abandon this latter assignment of error, he has offered no evidence in support of it. Findings of Fact The facts which were stipulated are so found. *296 The petitioner is an individual residing in New York City and he filed his returns for 1942 and 1943 with the Collector of Internal Revenue for the Second District of New York. Facts as to Issue 1. Partial Debt Charge-Off The petitioner in August 1928 became interested in the possibilities of a fountain pen known as the "Chilton Pen" and decided to acquire an interest in the company that had been formed for its further development and marketing. The company was known as the Chilton Pen Company and was organized and existed under the laws of the State of Massachusetts with an authorized capital stock consisting of 18,250 shares of preferred stock and 38,250 shares of common stock. Upon investigation it was disclosed that in 1926 a group of Massachusetts investors had invested about $115,000 for the manufacture and sale of pens under the Chilton patents. The Chilton pens met with good public response in New England but additional capital was required in order to expand into other parts of the country. In 1928 the Chilton Pen Company interested a New York corporation known as the Improved Products Corporation in investing $250,000 in additional capital and agreeing to advance *297 a further sum of $250,000 if needed for the further expansion and growth of the company. The Improved Products Corporation was a company formed by a group of individuals to discover, develop, promote and market new products. Of the $250,000 which the Improved Products Corporation invested as capital in the pen company the petitioner, his father and cousin in August 1928, between them, furnished $25,000. In November 1929 petitioner was informed by the Improved Products Corporation that due to the stock market crash and their other commitments they were unable to meet the continued financial requirements of the pen company and were planning to liquidate the company at the end of 1929 or shortly thereafter. By November 1929 the Improved Products Corporation had invested about $200,000 in the capital of the pen company and had made loans to it aggregating $268,000. The company's sales territory had, in the meantime, been extended from New England to almost all of the territory east of the Mississippi River, had over 2,500 dealers, annual sales of about $250,000 and a book inventory of approximately $200,000. Petitioner and his father had been for many years engaged in developing new *298 ventures and felt that progress had been made by the pen company and the possibilities of the pen itself merited the continuation of the company rather than its liquidation. The petitioner was informed by the Improved Products Corporation that it was their opinion after nearly two years experience with the pen company and its products that another $300,000 would be required to put the company on its feet and that they would be willing to invest $50,000 of this amount if the remaining $250,000 could be supplied. Petitioner thereupon entered into an agreement with the Improved Products Corporation dated December 2, 1929 which provided for a new corporation to be organized under the laws of the State of New York to be known as the Chilton Pen Company, Inc., sometimes hereinafter referred to as the "New Company" with an authorized capital of 3,000 shares of preferred stock and 13,000 shares of common stock, to take over the assets and liabilities of the Chilton Pen Company of Massachusetts, sometimes hereinafter referred to as the "Old Company." It was provided that concurrently with the transfer of the property and assets from the Old Company to the New Company that petitioner was *299 to subscribe and pay for 8,000 shares of the common stock of the New Company at 10 cents a share and was to purchase from the New Company $225,000 in principal amount of its notes for the sum of $225,000 in cash, said notes to mature five years from the date thereof, to bear interest at the rate of six per cent per annum, payable semiannually. It was also provided that these notes at the option of the holder were to become immediately due and payable in the event of any voluntary dissolution or liquidation of the New Company or in the event that the New Company shall go into voluntary bankruptcy or insolvency or apply for or consent to the appointment of a receive of itself or of its property or make any general assignment for the benefit of its creditors or shall be finally adjudicated bankrupt or insolvent. It was provided that the New Company, in consideration of the transfer to it of all the properties and assets of the Old Company, and was to assume all the liabilities and obligations of the Old Company and was to issue to the Old Company 3,200 shares of its common stock and in consideration of the cancellation by the Improved Products Corporation of the notes of the Old Company *300 in the aggregate amount of $268,000 to issue to the Improved Products Corporation or its order preferred stock at a value of $100 per share as will equal the principal amount of the notes, plus accrued interest thereon in full payment and satisfaction of said notes and the Improved Products Corporation was to cancel and deliver said notes to the New Company. The New Company was to sell to the Improved Products Corporation 1,600 shares of its common stock at 10 cents a share and $25,000 in principal amount of its notes for the sum of $25,000 in cash, said notes to mature five years from the date thereof, to bear interest at the rate of six per cent payable semiannually, and to contain the same provisions as to the acceleration of the maturity thereof as set out above. In accordance with this agreement on or about December 1929 a new corporation was organized under the laws of the State of New York under the name of Tap Pen Company and in or about January 1930, pursuant to the above agreement dated December 2, 1929, it took over all the assets and liabilities of the Old Company for which it issued to the Old Company 3,200 shares of its common stock and issued to the Improved Products *301 Corporation 2,760 shares of its preferred stock in full payment and satisfaction of its notes in the amount of $268,000, plus accumulated interest thereon. The New Company also issued 1,600 shares of its common stock to the Improved Products Corporation and 8,000 shares of its common stock to petitioner in accordance with the above agreement. Subsequently the New York Corporation changed its name from the Tap Pen Company to the Chilton Pen Company. The New Company took over the management of the affairs of the Old Company. On March 27, 1931, by certificate of the stockholders of the New Company filed in the office of the Secretary of the State of New York, the number of shares of the Chilton Pen Company was increased from 16,000 to 22,360, all without par value, divided into 5,000 shares of prior preferred stock, 2,760 shares of preferred stock and 14,600 shares of common stock. The 12,800 authorized and issued shares of common stock were changed to 14,600 shares of such stock and the capital of the company was reduced from $325,220.76 to $29,060. At a special meeting of the board of directors held on March 31, 1931 it was directed that the officers execute and deliver certificates *302 representing 2,760 shares of the new preferred stock to the record holder of the 2,760 shares of the old preferred stock and to execute and deliver certificates representing 14,600 shares of new common stock to the record holders of the 12,800 shares of the old common stock in proportion to the number of shares held by each. The secretary reported at this meeting that petitioner was the owner of five notes of the company aggregating $290,000 representing monies loaned to the company for its corporate purposes and that petitioner had offered to surrender these notes to the company in exchange for 2,900 shares of the New Company's prior preferred stock. By resolution then adopted the offer was accepted. It was also reported that Carleton Macy was the owner and holder of a note in the amount of $10,000 dated January 10, 1930 and due January 10, 1935 and that he had offered to surrender this note to the company in exchange for 100 shares of the New Company's prior preferred stock. This offer was duly accepted. The petitioner at said meeting also offered to subscribe for 2,000 shares of the New Company's prior preferred stock for $200,000 in cash which offer was accepted. It was also reported *303 by the secretary that the petitioner had made various advances to the company from time to time since November 5, 1930 on open account, subject to call with interest at the rate of six per cent per annum, the principal of which advances aggregated $130,000 and that petitioner had offered to waive interest on these advances and to accept $130,000 in cash in full payment thereof, provided such payment was made on or before March 31, 1931, which offer was accepted by the company. After the recapitalization of the Chilton Pen Company as above set out it was again in need of working capital and from May 3, 1932 to October 27, 1936 petitioner made advances to the Chilton Pen Company of amounts totaling $550,000 as follows: $74,000 in 1932, $103,500 in 1933, $96,000 in 1934, $148,000 in 1935 and $128,000 in 1936. These advances were carried on the books of the petitioner and also on the books of the Chilton Pen Company as loans on open account carrying interest compounded at the rate of six per cent per annum. Petitioner advanced the various amounts from time to time as the needs of the pen company required and interest was compounded at six per cent in accordance with petitioner's customary *304 practice of promoting and developing enterprises. Petitioner received no interest on these advances. The petitioner did not at any time during the period May 3, 1932 to Cotober 27, 1936 make a demand upon the company for the payment of the advances as he considered the company at that time unable to pay the advances. He expected that the company at some time in the future would be able to repay him. In 1936 the pen company also received loans from the Hudson Company and a loan from the petitioner's sister, Edytha Macy Mickles, in the amount of $100,000. In December 1936 the pen company paid to the petitioner the sum of $248,000 and entered such payment on its books as a credit against the aforementioned advances, thereby reducing the balance to the sum of $302,000. The Hudson Company was a corporation in which the petitioner and members of his family were interested. It was organized in 1917 by petitioner's father through which he made investments in other companies. The petitioner's father, when he died in March 1930, owned 75 per cent of the stock of the Hudson Company and 25 per cent was owned by petitioner, a brother and his sister, part of which was held in trust and a part *305 had been acquired by gift or purchase. After the death of petitioner's father in 1930, the stock of the Hudson Company was owned by petitioner, his brother and sister and part held in trust for their benefit. In 1936 petitioner transferred to the Hudson Company by sale 4,900 shares of prior preferred stock of the Chilton Pen Company which petitioner had acquired and the Hudson Company remained in possession of this stock during the period 1936 through 1942. Between 1936 and April 1942, the Hudson Company made various advances to the pen company and it was agreed between the petitioner and his sister, as creditors, that if the Hudson Company would make these advances that any monies loaned by the Hudson Company after 1936 should be first repaid before petitioner and his sister were paid for their advances prior to 1936. The Chilton Pen Company ceased active operations in April 1942 due to lack of business and difficulties in obtaining personnel and supplies of materials due to the war and the company was not of a size or type that could convert economically to war work. Also the type of construction of the Chilton pen would not meet the specifications set by the Armed Forces. When *306 the company ceased operations in April 1942 its outstanding indebtedness amounted to $671,500. Of this amount, computed without interest, $302,000 was owed to petitioner, $100,000 to petitioner's sister and $269,500 to the Hudson Company. Other trade creditors of the pen company whose claims were comparatively small were paid in preference to petitioner, with his consent, when operations ceased in 1942. It has been stipulated that "As at December 31, 1942 the balance sheet of the Chilton Pen Company, Inc. as revealed by the books, was as follows": Assets
Cash and receivables (after reserves of $116.83)
$ 1,836.80
Machinery (after depreciation of $1,218.60)
135.43
Patents
$117,370.88
Trade-marks
92.25
Goodwill
25,000.00
142,463.13
Total
$ 144,435.36
Liabilities
Loans payable: Valentine E. Macy, Jr.
$302,000.00
Hudson Company
269,500.00
Edytha Macy Mickles
100,000.00
671,500.00
Accrued interest on above to April 30, 1942
347,210.34
Capital stock: Prior prefered 5,000 shares
$400,000.00
Preferred 2,760 shares
27,600.00
Common 14,600 shares
1,460.00
429,060.00
Deficit
(1,303,334.98)
Total
$ 144,435.36
Petitioner *307 estimated that the entire assets of the Chilton Pen Company after it ceased business in 1942 did not have a value greater than $150,000. He calculated that the most he could collect as his creditor share of this amount would be $67,460. Petitioner thereupon determined that $234,539.10 of his $302,000 debt against the pen company was worthless and he charged that amount off his books prior to the end of the year 1942 and deducted that amount as a partially worthless debt on his income tax return for 1942. The assets of Chilton Pen Company did not have a value greater than $150,000 at the end of 1942. The pen company has not manufactured or sold any fountain pens since 1942 but has retained the charter in order to hold on to its patents and the Chilton name for the purpose of better realizing upon such assets. The advancements made by petitioner to The Chilton Pen Company during the period May 3, 1932 to October 27, 1936 were bona fide loans and the indebtedness to the petitioner from the Chilton Pen Company was worthless to the extent of $234,539.10 and was a business rather than a nonbusiness bad debt. Issue 2. Bad Debts Charged Off in 1943 In 1937 the petitioner, together with *308 Messrs. M. H. Hoepli and William D. Vogel, formed a partnership known as Hoepli & Co. for the development and exploitation of new patents, processes and products. The petitioner and Vogel were limited partners, the petitioner investing as a capital contribution $40,000 and Vogel $20,000. Hoepli was a general partner and his contribution consisted of his services, contracts and patents. Among the patents and processes in which Hoepli & Co. were interested was the manufacture of ramie cloth, a flying-wing type plane, the importing of Mexican diatomite, a French paper sizing, certain lithographic inks and chemicals, a moth proofing compound, a type of blue glass, a bullet and puncture proof tire, a variable pitch aircraft propeller and a devise for converting an automatic pistol into a light machine gun. Between August 1939 and October 1940 the petitioner advanced $17,000 to Hoepli & Co. for which the firm executed and delivered its collateral promissory note in this amount dated October 5, 1940 payable on demand after December 1, 1940 with interest at six per cent. The note listed eight items of collateral security as having been deposited with petitioner as security for the payment *309 of the note or any other liability or liabilities of the firm to petitioner due or to become due or that may be hereafter contracted. The items of collateral security were 34,200 shares of the 25 cent par value common stock of Sparks Extrusion Corporation; 10 shares of no part value common stock of Cornelius-Hoepli Corporation; 190 shares of the 10 cent par value common stock of Graphic Process and Products Corporation; the one-half interest owned by Hoepli & Co. in the Mitchell patent applications, serial numbers 239,462 November 8, 1938 and 299,099 October 12, 1939 for a moth proofing compound; United States patent numbers 1,996,938 April 9, 1935, 1,995,333 March 26, 1935 and Canadian patent number 354,504 granted to Henry Svensson and concerning a speed changer; all notes of the Sparks Extrusion Corporation held by Hoepli & Co. aggregating $6,266.66; the option held by Hoepli & Co. to purchase for $13,000 until November 3, 1942, 20 shares of the no par value common stock of Cornelius-Hoepli Corporation; and any stock which Hoepli & Co. may receive in a company which shall serve the purpose of selling Mexican diatomite in the United States. It was provided that in case of the nonpayment *310 of the note petitioner was empowered to sell the above collateral to satisfy the note. On November 4, 1940 Hoepli & Co. executed a promissory note for additional advances by petitioner payable to the petitioner in the amount of $1,000 payable on demand after December 1, 1940 with interest at six per cent per annum. This note set out that the collateral deposited as security therefor was the same collateral listed above for the payment of the above note in the amount of $17,000. This note provided that in case of the nonpayment thereof at maturity petitioner was empowered to dispose of the collateral. Hoepli & Co. was dissolved in 1943 and no part of its promissory notes was paid to petitioner. The collateral pledged as security for the above notes to petitioner was worthless in 1943. The 34,200 shares of the 25 cent par value common stock of the Sparks Extrusion Corporation and the notes of the Sparks Extrusion Corporation aggregating $6,260.66 were worthless in 1943 as will be more specifically referred to hereinafter. The 190 shares of the 10 cent par value common stock of Graphic Process and Products Corporation were worthless as the company had failed in 1942. The one-half interest *311 owned by Hoepli & Co. in the Mitchell patent applications, serial numbers 239,462 November 8, 1938 and 299,099 October 12, 1939 for a moth proofing process was worthless. Petioner tried to sell the one-half interest in these patents but was unable to do so. The 10 shares of no par value common stock of the Cornelius-Hoepli Corporation were worthless in 1943. Cornelius was an inventor and aircraft engineer who had patents on a flying-wing type plane. Cornelius-Hoepli Corporation was formed to build a small model plane and Hoepli & Co. received a stock interest. Petitioner was unable to dispose of this stock. Likewise the option held by Hoepli & Co. to purchase for $13,000 until November 2, 1942, 20 additional shares of no par value common stock of the Cornelius-Hoepli Corporation was worthless in 1943. The indebtedness due to petitioner from Hoepli & Co. in the aggregate amount of $18,000 became worthless during 1943 and was a business bad debt. In early 1939 the petitioner, together with Hoepli & Co. and Stanley W. Sparks, who was an outstanding metalurgist, formed a syndicate to acquire an interest in the patents and processes covering the extrusion of steel and to form a corporation *312 for its further development. "Extrusion" was a process for the shaping of metal under high pressure and temperature. The various patents covered the extrusion of automobile wheel hubs, cylinders of shock absorbers, automobile and aircraft pistons and small arms and artillery shell cases. The petitioner loaned this syndicate the sum of $15,000 with the understanding that when the corporation was formed it would assume this loan. The Sparks Extrusion Corporation was formed on or about October 24, 1939 and issued its collateral promissory note to petitioner dated December 7, 1939 for the sum of $15,000, payable July 1, 1940 without interest. There was pledged as security therefor 60 shares of capital stock of the Extrusion Engineering Corporation; 1,550 shares of the capital stock of Sparks Processes, Inc.; all the right, title and interest of Stanley W. Sparks in and to a syndicate agreement dated July 26, 1928 between C. R. Dean, R. H. Bohn, C. H. Bickell and Stanley W. Sparks. It was provided that upon the nonpayment of this note upon its due date that petitioner or the holder thereof shall have the right to dispose of the collateral in payment of the note. It was also provided that *313 by the acceptance of the note the petitioner agrees that if the sum of $65,000 has not been secured in cash by the Sparks Extrusion Corporation by July 1, 1940 the petitioner will extend the time of the payment of the note for 90 days until October 1, 1940 and if on or before October 1, 1940 the Sparks Extrusion Corporation shall not have adequate funds to meet said note the petitioner will extend it for a further period of 90 days until January 1, 1941. Throughout 1940, 1941 and 1942 and the early part of 1943 the Sparks Extrusion Corporation was in negotiation with various manufacturers who might be interested in using the Sparks Extrusion patents and processes in their business. In order to demonstrate the possibilities and practicabilities of such patents and processes, it was necessary to have the use of heavy hydraulic presses and furnaces but due to the war the demand for such equipment was so great that it was impossible to acquire the use of same for purely demonstration purposes. Moreover the prospective users of these patents indicated that they had more than they could do to handle the business they had, using the processes with which they were already familiar and would *314 not have the time to develop new processes. In 1942 Sparks' health began to fail, by 1943 he was almost a semi-invalid and in June 1944 he died. The Sparks Extrusion Corporation never manufactured anything; its only assets were these patents and the technical knowledge of Sparks. In 1943 the Sparks Extrusion Corporation was without funds, was unable to pay Sparks' salary, was unable to pay franchise taxes of the State of Delaware and forfeited its charter on April 1, 1943 for nonpayment of taxes. Petitioner never received any part of the $15,000 note due him by Sparks Extrusion Corporation. In 1943 the patents of Sparks Extrusion Corporation were taken over by petitioner but he was unable to dispose of them and due to the war it was an unfavorable time for any new process or product to be developed. Petitioner was also unable to realize any amount on the collateral pledged as security for the above note. The only assets of the Extrusion Engineering Corporation and of Sparks Processes, Inc. were patents and processes that Sparks had developed. Both of these corporations were without funds and due to the war it was an unfavorable time for any new process to be introduced and developed. *315 Petitioner made several efforts to dispose of the assets of these companies in 1943 but was unable to do so. The charter of the Extrusion Engineering Corporation was forfeited on December 27, 1944 and the charter of Sparks Processes, Inc. was forfeited on June 27, 1945 pursuant to the laws of the State of Connecticut under which they were organized. The interest of Sparks under the above syndicate agreement dated July 26, 1928 between C. R. Dean, R. H. Bohn, C. H. Bickell and Stanley W. Sparks was also worthless in 1943. Petitioner never made a demand for the payment of the note on its due date on July 1, 1940 as he was familiar with the financial condition of the company at that time and agreed not to make demand pending the further development of some of the patents and negotiations which were then being carried on and were carried on into 1943 with various metal companies. The indebtedness due to the petitioner from the Sparks Extrusion Corporation in the amount of $15,000 became worthless during 1943 and was a business bad debt. Facts as to Petitioner's General Business Activities Petitioner has for a number of years maintained an office for the regular transaction of *316 business at 50 Broadway, New York City, where he employed a bookkeeper, stenographer and three other persons. Books are regularly kept for the various trusts and corporations in which petitioner has an interest. In 1923 petitioner went to work for his father and was with him for many years engaged in promoting and developing various enterprises and since his father's death in March 1930, the petitioner has been the business manager of his family's interest in various enterprises as well as his own. The petitioner, his father, brother and sister had a large amount of money invested in a real estate corporation which was engaged in developing real estate in Nassau and Westchester Counties. This corporation has been engaged in building houses, financing builders, selling properties to individuals and helping them finance their own homes. The petitioner determined sales policies, negotiated prices and terms, and exercised general supervision over these activities. The total investment of petitioner and his family in this activity has been over $2,000,000. Petitioner and his father were also interested in Westchester County Publishers, Inc. which published four weeklies and eight dailies *317 in Westchester County and at the time of petitioner's father's death in 1930 they had over $3,000,000 invested in these papers of which $150,000 was in the form of loans and between 1930 and 1942 the petitioner and his family made further loans of a total of about $2,700,000. Petitioner was also interested in the promotion and development of approximately 20 other business enterprises and ventures including cotton mills, coal mines, railroads, petroleum, mining, photographic equipment, radio broadcasting, and many others. Petitioner and his family had several millions either loaned to or invested in these enterprises. The petitioner was sometimes a director and an officer in these corporations. The petitioner was actively engaged in furthering the interests of these various corporations and enterprises, devoting his entire time and attention thereto. He arranged for financing, determined policies, participated in the selection of various top personnel and in the decision of over-all policy problems. Opinion BLACK, Judge: The first issue for our consideration is whether or not petitioner is entitled to a bad debt deduction for the taxable year 1942 in the amount of $234,539.10 *318 as a partial loss on advances made to the Chilton Pen Company. The respondent contends that petitioner is not entitled to the deduction for three reasons: First, that the advances to the company were contributions to capital and were not loans; second, that the debt was of a nonbusiness character and any losses attributable thereto should be treated as a loss from the sale of a capital asset held not longer than six months; and third, that the loss claimed is excessive in view of the existing assets available to the corporation. The applicable statute is section is 23(k) of the Internal Revenue Code. [1]
*319 We will first consider whether the amounts advanced to the Chilton Pen Company were contributions to capital as contended by respondent or were loans as contended by petitioner. Funds advanced by shareholders to their corporation may or may not be contributions of capital depending upon the circumstances under which the advances were made. In determining whether or not these advances by the petitioner were loans or contributions to capital the question is whether the parties intended them to be loans or whether it was intended to enlarge the stockholder's stock investment. Cf. Edward Katzinger Co., 44 B.T.A. 533, affirmed 129 Fed. (2d) 74; Van Clief v. Helvering, 135 Fed. (2d) 254. We think the evidence in the instant proceeding establishes the fact that the advances in question were loans and were so regarded by the parties. It is true that at the time the petitioner made the advances the financial condition of the pen company was not good and these advances were made from time to time by the petitioner to enable the company to meet current obligations so as to enable it to continue in business. Even though the loans when made were hazardous *320 we do not understand that a debt, which under all other conditions and circumstances is a valid debt, is rendered invalid because at the time the loan is made its collection at maturity would seem hazardous. If the lender has good reason to believe that notwithstanding the apparent hazards which surround the loan that the debtor will repay, then the debt is valid. The evidence convinces us that when petitioner made these loans to the corporation he had strong hopes that the corporation would ultimately be successful and would repay the loans. The facts show that the company was actively engaged in business and while it had not made a financial success, nevertheless, it was constantly endeavoring to improve that situation. The entire record shows that petitioner had great confidence in the success of the Chilton pen and confidence in the ultimate success of the company. The record shows that during the period of the advances the pen, which apparently was a good fountain pen, was continually being improved and various methods were being tried for increasing sales, such as securing additional high class dealers, the making of special inlaid pens for various firms and contracting with *321 large users of pens such as department stores and mail order houses and in developing export trade. These efforts to make the company a success continued until 1942. Due to the war, however, the company was prevented from getting materials and was losing man power due to the draft and the company was not of a size or type that could readily convert to war work and the type of construction of the Chilton pen would not meet the specifications for pens set by the Armed Forces. It was then that the corporation ceased operations. Following this petitioner determined his debt to be partially worthless to the extent of $234,539.10 and charged that amount off on his books. Petitioner has never collected any of this amount since then. Respondent next contends that even though the Court should hold that these advances represented valid debts, nevertheless, they were nonbusiness debts and any losses attributable thereto should be treated as from the sale of a capital asset held not longer than six months. Section 23(k)(4) of the Internal Revenue Code provides that the term "non-business debt" means a debt other than one "evidenced by a security as defined in paragraph *322 (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." The loans herein were not evidenced by security as defined in paragraph (3), supra. We think that the debts herein were business rather than nonbusiness bad debts because the evidence shows that they had a direct connection with the business carried on by the petitioner and the loss was the result of and incurred in the petitioner's business of promoting various enterprises and corporations which business was carried on by the petitioner during the years involved and had been carried on by him for many years prior thereto. The question of whether or not a taxpayer is engaged in business or is a mere investor depends upon the facts in each case. In Foss v. Commissioner, 75 Fed. (2d) 326, the court said: "The line comes between those who take the position of passive investors, doing only what is necessary from an investment point of view, and those who associate themselves actively in the enterprises in which they are financially interested and devote a substantial part of their time to that work as a matter of business." The evidence shows that the *323 petitioner and his father had for many years been engaged in developing new enterprises and after his father's death the petitioner carried on this work. He maintained an office, employed competent help and devoted his entire time and attention to promoting the interests of these various enterprises and corporations in which he had investments, not for the purpose of merely conserving them, but for the purpose of carrying them on successfully and making them profitable. He participated in the financing of these enterprises and corporations which sometimes took the form of loans and in others he acquired stock and some cases, both. He was a director and an officer of many of these corporations and frequently consulted and advised with them. These activities constituted the petitioner's business in which he had been engaged for many years. The promotion of the Chilton Pen Company was not an isolated venture but was typical of the manner in which petitioner carried out his business ventures. We think, therefore, that the loans to the Chilton Pen Company were made in the course of the petitioner's business operations and the worthlessness applicable thereto is deductible as a business *324 bad debt within the meaning of section 23(k) of the Internal Revenue Code. See Washburn v. Commissioner, 51 Fed. (2d) 949; Foss v. Commissioner, supra; Glenn M. Averill, 20 B.T.A. 1196, and Vincent C. Campbell, 11 T.C. 510. Respondent further contends that even if we should find that these advances were business bad debts, nevertheless, the amount deducted by petitioner for partial worthlessness thereof is excessive. Respondent maintains that the value of the assets of the Chilton Pen Company in 1942 was worth not less than $290,000 and based upon this valuation the petitioner's loss and partial worthlessness would be $171,575.86 rather than the amount of $234,539.10 claimed by petitioner. Petitioner testified that he discussed with the other directors of the pen company the value of the assets of the pen company and it was determined that the value thereof in 1942 was not in excess of $150,000 and he determined that his share of these assets as one of the creditors of the corporation would not be more than $67,460.90, resulting in a partial worthlessness of $234,539.10 ($302,000 minus $67,460.90). It may *325 be further noted that the respondent in his determination of the deficiency did not question but that petitioner's advances to the corporation had become worthless to the extent of $234,539.10 as claimed by petitioner. In fact respondent determined that the entire amount of petitioner's advances of $302,000 to the corporation became worthless in 1942. However, respondent determined that petitioner's loss was not a bad debt loss but was a capital loss and limited in amount to $1,000 because petitioner's advances to the corporation represented investments and not loans. We think there is no merit in respondent's contention that petitioner's partial charge-off of $234,539.10 was excessive. We hold, therefore, that the indebtedness due to the petitioner from the Chilton Pen Company was worthless to the extent of $234,539.10 at the end of 1942 and the respondent erred in disallowing the deduction. The second issue for our consideration is whether the amounts loaned by petitioner to Hoepli & Co. in the aggregate amount of $18,000 and the loan to the Sparks Extrusion Corporation in the amount of $15,000 were deductible in 1943 as bad debts. The respondent contends that these notes were *326 not shown to have become worthless during the taxable year 1943 and further that any loss attributable to the note for $15,000 owing by the Sparks Extrusion Corporation is not deductible as one incurred in the taxpayer's trade or business but was a nonbusiness debt. Respondent apparently concedes that the notes made by Hoepli & Co. were business debts. We will first consider whether the note owing by the Sparks Extrusion Corporation was a business or a nonbusiness debt within the meaning of section 23(k)(4) of the Internal Revenue Code. We have found in our discussion of the first issue hereinabove that the advances to the Chilton Pen Company were made in the course of the petitioner's business and therefore were business debts. We also think that the note of the Sparks Extrusion Corporation was a business rather than a nonbusiness debt because the evidence shows that it had a direct connection with the business carried on by the petitioner and was incurred in the petitioner's business of organizing and promoting various corporations and enterprises as we have more fully set out above. The respondent contends that the evidence does not establish the worthlessness *327 of the notes or of the collateral which were pledged as security. Section 23(k) of the Internal Revenue Code provides that in computing net income there shall be allowed as a deduction "Debts which become worthless within the taxable year." The question for our decision, therefore, is whether these debts actually became worthless during the taxable year 1943. The burden is upon the petitioner under the statute to prove that these debts against Hoepli & Co. and the Sparks Extrusion Corporation actually became worthless during the taxable year 1943. The respondent maintains that evidence of the worthlessness of the notes herein and the collateral pledged as security therefor are not sufficient to overcome the presumptive correctness of respondent's determination. We do not agree with this contention. The facts show that in 1937 the petitioner invested $40,000 in the firm of Hoepli & Co. as a limited partner and between 1939 and 1940 advanced an additional $18,000 to the company as loans. The evidence in the record is to the effect that Hoepli & Co. never manufactured or sold any products and that its patents and processes were never put into practical use during *328 the period 1937 to 1942. The partnership itself was dissolved in 1943. The facts show that the Sparks Extrusion Corporation was organized on or about October 24, 1939 for the purpose of developing a process for extrusion of steel. This was a process for the shaping of metal under high pressure and temperature. Throughout 1940, 1941, 1942 and the early part of 1943 the Sparks Extrusion Corporation was in negotiation with various manufacturers who might be interested in using the Sparks Extrusion Corporation's patents and processes in their business. In order to demonstrate the possibility and practicability of such patents and processes it was necessary to have the use of heavy hydraulic presses and furnaces but due to the war the demand for such equipment was so great that it was impossible to acquire the use of such equipment for purely demonstration purposes. Moreover, the prospective users of these patents and processes indicated that they had more than they could do to handle the business they had by using the processes they were already familiar with and did not have the time to develop new processes. The Sparks Extrusion Corporation never manufactured or sold anything. Its only *329 assets were its patents and the technical knowledge of Sparks. In 1943 the facts show that the Sparks Extrusion Corporation was without funds and forfeited its charter in 1943 for nonpayment of taxes to the State of Delaware. Also in April 1942 Spark's health began to fail, by 1943 he was unavailable for consultation with reference to these various patents and processes and in June 1944 he died. Petitioner testified that in 1943 he was unable to realize any amount on the assets of either Hoepli & Co. or of the Sparks Extrusion Corporation or on the collateral pledged as security for these notes. The petitioner had been actively working with these corporations during this period and knew what their financial condition was. We think that petitioner made an honest effort to dispose of the assets of these companies and was unable to do so. Respondent also claims that petitioner should have instituted legal proceedings under the laws of New York to determine the value or lack of value of the collateral. Legal action to foreclose the pledgor's equity and to have a public sale for the sale of the collateral where such action is not justified by any hope of collection is not a prerequisite *330 of the allowance of a deduction of a debt for worthlessness. William Purvin, 6 T.C. 21, and Edward K. Johnstone, 17 B.T.A. 366. We think that petitioner made an honest effort to recover on the collateral and that the conclusion reached by him in the taxable year 1943 that it was worthless was, under the facts known to him, reasonable and justified. Respondent also maintains that petitioner never made a demand upon Hoepli for contribution, that since Hoepli was a general partner he was liable in contribution to petitioner for any loss suffered from nonpayment of the note. Crater v. Bininger, 45 N. Y. 545; Brown v. Spohr, 180 N. Y. 201. Petitioner testified that he knew that Hoepli would be unable to make any contribution to petitioner as he had used up whatever capital he had in continuing the firm Hoepli & Co. from 1940 to 1943. He also testified that he made no effort to collect from Hoepli as he knew that his financial situation was such that a legal action against him would be an additional expense without recovery. As we have pointed out above, legal action under such circumstances is unnecessary. Petitioner has never collected *331 anything on either of these debts and we think his claim that they both became worthless in 1943 is sustained by the evidence. We so hold. The petitioner affirmatively alleged in his petition that the respondent erred in failing to allow as a deduction from income for the year 1943 the amount of $42,921.68 for a noncapital loss sustained by petitioner on the disposition in 1943 of 950 shares of the capital stock of the 36 East 72nd Street Corporation and the termination of his proprietary lease. The petitioner at the hearing, however, offered no evidence with respect thereto and has abandoned this contention. See Louis Halle, 7 T.C. 245. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxabe year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a nonbusiness debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩